### NEWBURY and others *v.* FOWLER.[1]

*(Circuit Court, N. D. Illinois. August 2, 1886.)*

1. PATENTS FOR INVENTIONS—TIME-LOCKS.
   Letters patent No. 262,093, of August 1, 1882, to Henry F. Newbury, for an improvement in time-locks, construed, sustained over the defense of want of novelty, and found infringed.

2. SAME—PATENTABLE NOVELTY.
   Prior to the making of the patented device, combination locks for vaults and safes, having supplementary devices for dogging the bolts of the door in the locked position, in case the lock was driven or blown off, or separated from the door-plates, were old, and it was also old to use time-locks in connection with such combination locks and dogging devices. The patent described a supplemental locking mechanism, adapted to be called into action by a shock sufficient to break or displace the parts of the time-lock without driving it from the door. *Held;* that the device possessed patentable novelty.

3. SAME—INVENTION.
   "It required inventive genius to conceive and adapt to a time-lock a supplemental mechanism which would remain inert until the time-lock was broken, and then be brought into action by the violence or shock which broke the time-lock, or destroyed its efficiency."

4. SAME—UTILITY—INFRINGEMENT—ESTOPPEL.
   One who has appropriated an invention ought not to be heard to question its utility.

5. SAME—UTILITY—INCREASED SALABILITY.
   Any invention which increases the salability of an article may be said to contain the elements of utility.

In Equity.
*Sam'l A. Duncan* and *Horace S. Oakley*, for complainants.
*West & Bond*, for defendant.

BLODGETT, J. This is a bill in equity for an accounting and injunction, by reason of the alleged infringement of patent No. 262,-093, granted August 1, 1882, to Henry F. Newbury, for "an improve-

[1] Edited by Charles C. Linthicum, Esq., of the Chicago bar.

ment in time-locks." This patentee does not claim to have invented a time-lock, and the class of locks known as "time-locks" seems to have been well known in the art since about 1847, although they do not appear to have come into general use until about the year 1870 as a device for protecting vault and safe doors against burglars. These time-locks, as now applied to safe and vault doors, are used mainly as auxiliaries to the usual locking devices, by holding a check or dog, which is moved by a time mechanism, against some part of the lock, so as to prevent the retracting of the locking bolt, or the unlocking of the safe, until the clock-work or time mechanism removes this check or dog out of the pathway of the bolt, when the bolt can be retracted or drawn back, and the door opened; this clock-work being set to remove the check or dog out of the way at the time when the door is to be opened. It was at first assumed that the reinforcement of the well-known lock by this time mechanism, which was wholly within the interior of the save or vault, and could not be manipulated from the outside, furnished a complete protection against the devices of the burglar. This patentee, however, claims to have discovered that this time mechanism, being necessarily, in order to operate surely and accurately, very delicate and frangible in its structure, like the works of a first-class watch or other time-piece, can be readily broken or disabled by a blast from a cartridge of dynamite, or other high explosive substance, against the outside of the safe door, and even by blows from a heavy sledge, so that the clock-work would immediately run down, and remove the check or dog of the time-lock out of the way of the bolt; when the door could at once be opened, either by the burglars having obtained the combination of the lock, or by forcing the lock from the door-plate by the introduction of gunpowder, or by drilling a hole through the door-plate, and driving off the lock by means of a punch and sledge-hammer; and to avert this danger is the purpose of the device covered by this patent, by providing a supplemental dogging or checking device, which shall come into action, and either dog the bolts of the lock or the time mechanism whenever the normal operation of the time-lock is defeated or destroyed by violence. That is, if by the explosion of dynamite, or by the blows of a sledge against the door, the time-lock is deranged or broken so as to begin to run down, the force which breaks or deranges the mechanism of the time-lock brings into action this supplemental dog or catch to prevent the locking bolts of the door from being retracted.

It is charged by this bill that defendant infringes the first claim of this patent, which is:

"(1) The combination of a chronometric or time lock and a supplemental locking mechanism, consisting of a dog or check, and means for holding such dog or check out of action during the normal condition of the time-lock, some part of this supplemental mechanism being arranged in proximity to the lock substantially as set forth, whereby the supplemental dog or check will be

brought into action to prevent the retraction of the door-bolts of the safe or vault on which the time-lock is used, on the occurrence of a shock capable of breaking or displacing the parts of such lock."

It is admitted that defendant is a manufacturer of safe and vault locks, and that, since the granting of complainants' patent, he has placed upon the door of the vault of the Second National Bank of East Saginaw, Michigan, a lock with a time mechanism, containing a supplemental device, which, under ordinary conditions, is inoperative to prevent the withdrawal of the door-bolts, but, in the event of a heavy and sudden shock against the outside of the door, calculated to injure the time mechanism, this piece will be moved by such shock from its normal position, and thus prevent the retraction of the door-bolts. The defendant's lock has no knob or handle by which it can be actuated from the outside of the door, but is provided with a group or nest of springs, one set of which act to shoot the locking bolts into the locking position, and thereby lock the door when the door is closed and these locking springs released by a trip, while another set of springs act to retract the bolts and unlock the door when released by the operation of the time mechanism.

The defenses interposed may be considered under two heads: (1) That complainants' patent is void for want of novelty; (2) that defendant does not infringe complainants' patent.

As to the question of the patentable novelty of complainants' device, the proof shows that, in 1865, a patent was granted to John Farrel for an "improved safe-lock," in which was shown and described an intermediate mechanism, which, so long as the lock is in place, will admit of the locking and unlocking the bolt or bolts which secure the door, and yet will secure the bolts in the locked position, when, by violent means, the lock is detached from the door, or its means of security are otherwise destroyed; and that, in 1866, Mr. C. M. Hendrickson, of Brooklyn, New York, put into public use, at Danbury, Connecticut, upon a safe for the Danbury & Norwalk Railroad Company, and subsequently, but before complainants' invention, put upon the doors of several other safes and vaults, a device by which the bolts of the lock would be dogged in case the lock was driven off or separated from the door. At the time these Farrel and Hendrickson devices were brought into use the usual method of burglars in attacking a safe or vault lock was either by driving or forcing the lock off from the inner plate of the door by means of a punch inserted through the key-hole, or a hole drilled through the door for the purpose, or by gunpowder blown into the lock, and then exploded; in which case it was expected that these supplemental dogging devices would come into action, and so dog or check the bolts as to effectually prevent the door from being unlocked. And the proof shows that after time-locks came into use they were applied to safe and vault doors in combination with locks provided with these supplementary dogging devices of Farrel and Hendrickson, so that, when

Newbury made the invention covered by his patent, it was old to apply to a combination lock a supplemental device for dogging the bolts in the door in the locked position, in case the lock was driven or blown off or separated from the door-plates; and also old to use a time-lock upon a safe or vault door in connection with a lock having such supplementary dogging device; and, this being the state of the art when this inventor entered the field, the question is, was there any patentable novelty in Newbury's device of a supplemental locking mechanism, to be only called into action in case of injury to or destruction of the time-lock, so as to prevent the retraction of the door-bolts?

Passing the question so much discussed in the testimony and argument as to whether the Farrel or Hendrickson devices would or would not be effective to defeat a burglarious attack, when used in connection with a time-lock, it is sufficient to say that it needs but an inspection of either of these devices to show that if the time-lock was so disabled by violence as to cause the withdrawal of its stop or check to the locking bolts, the lock would then be at the mercy of any burglar who had obtained, by treachery or compulsion, possession of the lock combination; and the time-lock being put out of the way, a burglar who had control of the combination of the lock could enter the safe or vault without violence, and without calling the supplemental dogging device of Farrel or Hendrickson into operation.

Neither the Farrel nor Hendrickson devices are organized or expected to become operative except when the lock is partly or wholly forced off the door; and this a burglar who had the combination, or expected to obtain it by treachery or intimidation, would be careful not to do, but would, on the contrary, be cautious to cause only just so much of a shock against the outside of the door as would disable the time-lock, and cause its check or stop to be withdrawn from the locking bolts, and would depend upon controlling the secret of the combination lock to open the door. The most that can be said is that a time-lock may be used with a lock containing these old devices, and, when so used, the time-lock is still subject to the infirmity which the Newbury invention was designed to cure; so that, if the time-lock be shattered by a shock, its usefulness as an adjunct to the old Hendrickson or Herring locks is destroyed, and the burglar has the same chance of getting access to the safe that he would if there were no time-lock on the door, as the destruction of the time-lock does not call into action the supplemental devices of Farrel or Hendrickson.

The proof in the case seems to me to fully sustain the proposition that Newbury was the first to produce a mechanism organized and intended to protect a safe or vault against danger from the disabling of the time-lock, and, as such, he is entitled to the full claim as stated; that is, for the combination with a time-lock of a supplemental locking mechanism, consisting of a dog or check, and means

for holding such dog or check out of action during the normal condition of the time-lock, but with the parts so arranged that the supplemental dog or check will be brought into action to prevent the retraction of the door-bolts on the occurrence of a shock capable of breaking or displacing the parts of the time-lock. The primary and controlling feature seems to me to be that the supplementary locking device is to be brought into action and made operative by the shock or violence which breaks or displaces or renders ineffective the time-lock.

As the proof now stands, no one appears to have done this, or attempted to do it, before Newbury. He claims to have discovered this vulnerable feature in the mere time-lock appliance to the protection of safes and vaults, and to have devised the mechanism shown in his patent to avert the danger.

It is urged in behalf of defendant that the idea of a supplementary dogging device, to be called into action only when the lock was forced wholly or partly off the door,—such as the Farrel and Hendrickson devices,—being old, there was no invention in applying some such supplemental dogging device to a time-lock. But it seems quite clear to me that these Farrel and Hendrickson devices cannot be made to co-operate with the organism of a time-lock, so as to perform the functions of the Newbury invention, by mere mechanical skill. It required inventive genius to conceive and adapt to a time-lock a supplemental mechanism which would remain inert until the time-lock was broken, and then be brought into action by the violence or shock which broke the time-lock, or destroyed its efficiency. It may not be a patentable invention to have discovered this weakness of a time-lock, and the necessity of some protection against it; but to have discovered the weakness, and devised a remedy, seems to me to make a meritorious invention. As one of the witnesses expresses it, "Newbury worked ahead of the burglar, and not behind him." He did not wait until some bold and successful burglary had demonstrated the necessity for his invention, but sagaciously saw the danger, and provided the guard in advance. He seems to me to have taken a step forward of all who had preceded him in this field, and to be entitled to a liberal construction of the first claim of his patent, so as to cover any supplemental locking mechanism which, when used in combination with a time-lock, shall prevent the retraction of the door-bolts in case of such shock or violence as will disable the time-lock, because he seems to have been the first to have discovered the need of such mechanism, and to have supplied the want.

Upon the question of infringement, the defendant contends that his supplementary dogging device is not in his time-lock; that his time-lock is not dogged nor prevented from running down; that his time-lock does not dog the door-bolts, and prevent their retraction until the hour for opening arrives; and hence that his supplementary dog is not used in combination with a time-lock within the meaning

of complainants' patent. He also contends that the complainants' device is designed to be used, and must be used, in connection with a lock which is operated from the outside of the door by a knob or T handle. As has already been said, defendant's lock shows an arrangement by which the locking bolts are automatically shot into the locking position, and retracted by means of two groups or sets of springs, and there is no handle or knob upon the outside of the door with which to move the bolts either to the locking or unlocking position; and the arrangement of parts is such that when the time-lock releases the lever which holds the retracting springs out of action, these springs at once withdraw the locking bolts, and the door is unlocked, and can be swung open; and the supplementary dog in the defendant's lock is so placed as to dog those retracting springs in case of such violence as will break or displace the parts of the time-lock. Here we have a time-lock and a supplementary dogging device which is intended to remain inert until the time-lock is disabled, and to be brought into action by the force which breaks the time-lock, so as to prevent the retraction of the locking bolts; that is, defendant dogs the retracting springs which control the movement of the locking bolts instead of dogging the bolts themselves.

I think there is no room for doubt that the function and mode of operation of defendant's supplementary dog is such as to bring it within the first claim of the patent. Defendant's lock, in which he dispenses with a knob, handle, or any other appliance for moving the locking bolts from the outside of the door, may be a meritorious invention; but it is apparent that a shock or blow which would break or derange the time-lock, so as to cause it to run down, would at once unlock the door; and hence a supplementary dog which will come into play to keep the retracting springs from unlocking the door is as much a necessity of the organization as it was of any of the locking devices where a time-lock was used when Newbury entered the field; and yet defendant did not adopt this supplemental mechanism, although he had covered the main features of his lock with a patent as early as 1879, until after Newbury's invention was brought out, and the public, as well as the defendant, instructed in regard to its utility and necessity.

It also appears from the proof in this case that locks which operated automatically to shut and withdraw the bolts were not new with this defendant, and that time-locks were made and applied to devices which had no handle or knob upon the outside of the safe or vault door with which to shoot and retract the bolts. I see nothing in Newbury's specifications, or in the form of his claim or application for his patent, which limits his device to a lock which is operated or manipulated from the outside by a knob or handle; but it is just as essential and necessary to a lock like defendant's, which is operated by a handle from the outside, as to a lock which is operated without a knob or handle.

There is no evidence in this record that either complainants' or defendant's device has ever yet been called into action, and actually defeated a burglarious attack upon a safe or vault; but the defendant has so fully appropriated the Newbury invention, and incorporated it into his lock, that he ought not to be heard to question its utility. It is certainly reasonable to assume that a new feature added to a lock which promises increased security from burglars would make the lock more salable, and justify the payment of a higher price for it; and any invention which increases the salability of an article may be said to contain the elements of utility.

A decree may be entered finding the patent valid, and that defendant has infringed it, and directing a reference to a master to take proofs, and report as to profits and damages.